The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Bost and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except with the modification of findings of fact and conclusions of law concerning discovery issues and attorneys fees on appeal.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties as
 STIPULATIONS
1. The parties filed a Pre-Trial Agreement dated 19 September 1997, and stipulations for admission of medical records dated 3 November 1997 and 15 July 1998. The stipulations contained in these documents are incorporated by reference as though fully restated herein. In addition, the exhibits stipulated into evidence by these documents and offered into evidence without objection at the depositions taken by the parties are admitted into evidence.
2. In addition, Forms 21 and 26, previously executed by the parties and constituting Awards of record and the Opinion and Award filed by Deputy Commissioner Wanda Blanche Taylor on December 9, 1996 are, as such, a part of the record and incorporated herein by reference.
3. Following the hearing before the Deputy Commissioner, depositions were taken from highway patrol officer Joey Robertson on November 6, 1997, Dr. Rupinder Kaur on January 5, 1998 and October 16, 1998, Dr. Angus McInnis on January 6, 1998, and Dr. Barrie Hurwitz on April 28, 1998. These depositions are a part of the evidentiary record in this matter.
 ***********
The Full Commission, based upon all of the evidence of record, adopts with modification the findings of fact found by the Deputy Commissioner as follows
 FINDINGS OF FACT
1. Plaintiff, who completed the tenth grade, worked as a carpenter beginning when he was a high school student. Before his July 14, 1992 injury, plaintiff was an experienced and excellent carpenter who could be entrusted to remodel a home, complete the trim work on a home, or build a deck to completion without direction. He could frame a house, build cabinets, make furniture or do any other woodworking project.
2. Before plaintiffs October 1993 back surgery, plaintiff was a very caring person. He had a good personality, was patient and interacted appropriately with his family and others. Also, plaintiff was strong emotionally. Dr. Angus McInnis has been plaintiffs family physician since 1976 and did not observe any unusual behavior or psychological problems before plaintiffs October 1993 surgery. However, Dr. McInnis observed that plaintiff "developed various emotional problems since the surgery, and hes had somewhat of a personality change, episodes of anxiety, episodes of depression, at times panic attacks. While plaintiff may physically be able to do certain work, Dr. McInnis does not believe plaintiff can work now in regular or competitive employment because of his emotional instability.
3. As a result of plaintiffs July 1992 back injury and related encephalitis, plaintiff has a frontal lobe syndrome coupled with an organic affective disorder. This causes plaintiff to be distractible, flippant, emotionally labile, euphoric and uninhibited. It also causes plaintiff to have lapses in judgment and scattered thinking. Plaintiff cannot control his emotions, is impulsive and explosive. Furthermore, plaintiff does not comprehend well. He invades others boundaries and does not know when to stop. Plaintiff is verbose and has difficulty concluding a train of thought. He has a significant impairment of attention and concentration skills. He cannot be depended upon to complete tasks. Plaintiff has panic attacks and has developed depressive illness as a result of his organic brain injury.
4. Plaintiffs cognitive and emotional impairments following the 1993 back surgery and associated encephalitis interfere with his ability to interact and work with other people. Plaintiff does not get along with his brothers and sisters and is unable to maintain his relationship with his previous girlfriend of more than ten years. His brother David observed that plaintiff blows up and goes into a fit for no reason. Plaintiff cannot be still, cannot keep his mind on one thing for long, and cannot stay with a task for long or to completion. Plaintiff has episodes where he cries and occasions where he has secluded himself inside rooms in the house in which he lives.
5. Following plaintiffs October 1993 back surgery, beginning on May 19, 1994, plaintiff returned to work for short periods on a part-time basis for Alan Miller, who was then a small contractor constructing homes. Plaintiff worked in Greensboro for several days in May 1994 and during a couple of weeks each month from July through November 1994 and in January 1995. After January 1995, plaintiff continued to call Alan Miller seeking work. However, Mr. Miller did not employ plaintiff because he felt plaintiff was unable to do anything on his job sites.
6. When plaintiff was working for Alan Miller, someone had to pick plaintiff up or plaintiff had to follow another employee from a familiar location to and from the job site. Mr. Miller observed that plaintiffs work habits were erratic. Plaintiff wandered around the site, talked a lot, playfully picked on other employees and was "constantly disruptive on the job site. Plaintiff did not stay on or complete tasks he was assigned, would put tools down and not be able to locate them, and would lose track of what he was doing. Plaintiff would forget on occasion where he was working in a home. Mr. Miller had to constantly watch and direct plaintiff to keep plaintiff on the task assigned and to tell plaintiff how to do these tasks. As a consequence Mr. Miller backed down plaintiffs level of work to find some level at which plaintiff could be productive. There was not a level where plaintiff was able to work or be productive.
7. Brenda Wrenn employed plaintiff in the early 1980s in her business constructing homes. Ms. Wrenn now owns a landscaping and grading business. Plaintiff was then a very competent carpenter who could be trusted, for example, to purchase materials and trim out a house on his own. Plaintiff also did work in 1989 on Ms. Wrenns new home by building a shop and deck. The quality of plaintiffs work then was of the highest quality. Ms. Wrenn considers plaintiff a friend because of their past relationship.
8. In approximately July 1996, Ms. Wrenn called plaintiff to help her correct the work of a framing crew constructing her sons home. Plaintiff helped Ms. Wrenn during a two or three week period. Plaintiff was not able to do this work, and Ms. Wrenn had to hire other carpenters to complete the job. When plaintiff tried to help, Ms. Wrenn found that his attention span was short and he could not concentrate on and complete tasks. Plaintiff would forget the tasks which needed to be accomplished. He could not find his way to a local store. For plaintiff to have accomplished these tasks, Ms. Wrenn believed it would have been necessary for her to get the necessary supplies and to stay with plaintiff and tell him what to do.
9. The surgeon who performed plaintiffs October 1993 back surgery, Dr. William Lestini, continued to see plaintiff through January 1995. At plaintiffs September 27, 1994 visit, Dr. Lestini stated that plaintiff had reached maximum medical improvement and sustained a 45% permanent partial disability to the spine. Dr. Lestini limited plaintiff on a permanent basis to "light duty restriction as a trim carpenter. Plaintiffs physical limitations were later increased to medium work with lifting up to 50 pounds occasionally and 20 pounds frequently.
10. Plaintiff came under treatment by Dr. Barrie Hurwitz, a Duke University Medical Center neurologist, beginning in February 1994. On February 21, 1994, Dr. Hurwitz felt plaintiff had a personality disorder and perhaps some intellectual impairment. Subsequently Dr. Hurwitz obtained additional studies, and on April 13, 1994, Dr. Hurwitz reported that an EEG revealed focal slowing and no evidence of active seizure disturbance. On October 17, 1994, Dr. Hurwitz recommended psychological testing and suspected plaintiff had "organic brain syndrome with significant involvement of the temporal lobe and perhaps the frontal lobe. This testing showed "cortical dysfunction consistent with his previous Herpes Encephalitis and significant psychological distress.
11. In December 1994, Dr. Hurwitz referred plaintiff to Dr. Victor Morcos for evaluation. Dr. Morcos is a Greensboro psychiatrist with Guilford Psychiatric Associates. Plaintiff was seen by Dr. Morcos on December 22, 1994 and again on January 11, 1996. Dr. Morcos concluded on December 22, 1994 that plaintiff had an "affective mood disorder with a degree of frontal lobe syndrome type picture with distractibility, mood lability, and slight explosiveness and a "patchy memory disorder.
12. On January 22, 1996, following his last examination, Dr. Morcos observed that "I doubt that he will be able to work in a normal work environment because of his distractibility, emotional lability and jocular disinhibitive behavior associated with the cognitive deficits noted in the psychological report from Dr. Logue at Duke University Medical Center. Dr. Morcos thus reported to plaintiffs rehabilitation nurse that plaintiff "continues to show a frontal lobe syndrome with affective lability secondary to the encephalitis, that he did "not anticipate any further changes, and that he suspected that plaintiff would "be living with this amount of dysfunction and disability permanently.
13. Plaintiff was seen by Dr. Indu Varia, a Duke University Medical Center psychiatrist, on several occasions in the spring of 1995 and during an August 1997 hospitalization. On March 13, 1995, Dr. Varia diagnosed obsessive compulsive disorder and panic disorder and "disinhibitory frontal lobe syndrome and personality changes due to herpes encephalitis. The diagnosis remained the same on April 5, 1995 and June 6, 1995 and during the August 1997 hospitalization. Dr. Varia observed on June 6, 1995 that she was then treating plaintiff for organic personality disorder.
14. Plaintiff worked with a private vocational specialist retained by defendants from August 1995 through April 1996. This activity consisted of an evaluation, meetings with the local Employment Security Commission office and an extensive unsuccessful job search, with contact with numerous employers in Rockingham County, both alone and in the company of the vocational specialist.
15. On July 16, 1996, defendants filed with the North Carolina Industrial Commission a motion to compel plaintiff to participate in a thirty day evaluation program at Goodwill Industries to "determine plaintiffs current work skills and to give consideration for possible work training at Goodwill Industries thereafter. Plaintiff filed a response in opposition to this motion.
16. On December 18, 1996, Deputy Commissioner Wanda Blanche Taylor ruled on defendants motion to compel plaintiff to participate in the Goodwill Industries evaluation. Deputy Commissioner Taylor denied the motion after concluding that "plaintiff suffers from serious emotional and mental difficulties and that the requested efforts are in addition to those already voluntarily participated in by the plaintiff, and that the requested efforts require an in-patient program or extensive commuting. She also referred plaintiffs claim to the Industrial Commission rehabilitation department for evaluation. Thereafter, defendants filed a Form 33 Request for Hearing to appeal Deputy Commissioner Taylors Order. Plaintiffs response to the hearing request asserted that the evidence supports Deputy Commissioner Taylors Order and that plaintiff is permanently and totally disabled and thus should not be required to engage in a futile search for employment.
17. Furthermore, defendants served plaintiff with Defendants First Set of Interrogatories to Plaintiff on December 23, 1996. Interrogatories 3, 4, 5 and 10 addressed plaintiffs employment before and after the October 1993 surgery and his search for employment since the October 1993 surgery including his abilities, which relate to work capacity. Plaintiffs Response to Defendants First Set of Interrogatories was not served on defendants until over eight months later on September 9, 1997 after a signed verification by plaintiff on September 8, 1997. The responses submitted by plaintiff omitted his work for Mr. Williams, which included construction and carpentry during October and November 1996 and again in May 1997. Defendants discovered this work through surveillance of plaintiff. Plaintiffs nondisclosure of the work for Mr. Williams is an omission at best and constitutes a violation of plaintiffs discovery obligations to truthfully answer all interrogatories.
18. In the absence of Dr. Victor Morcos, plaintiff was seen by his partner, Dr. Raouf Badawi, a board certified psychiatrist, on August 7, 1996. After interviewing plaintiff and reviewing Dr. Morcos chart, Dr. Badawi stated that plaintiff
 "has an established frontal lobe syndrome coupled with an organic affective disorder. When seen, he was distractible, flippant, and showed a non-specific thought disorder with lapses into poor judgment and reality distortion. His thinking was scattered and he showed evidence of euphoria with disinhibition.
It is my considered opinion that he cannot function in the work place, even in such a structured environment as Goodwill Industries offers. Simply stated, if stressed by such an undertaking, there is no doubt in my mind that he will end up in the hospital. I dont foresee that he will be able to work because he has permanent brain damage.
19. Plaintiff has visited the YMCAs in Eden and Reidsville, North Carolina for extended periods since his October 1993 surgery. He walks on the track, exercises on the equipment and talks with others participating in this activity. On January 30, 1997, after leaving the Eden YMCA, plaintiff started to jerk all over as he was driving his car on a secondary road in Rockingham County. Plaintiff looked at his hands, and they looked like they were spinning. The next thing plaintiff realized was when Highway Patrolman Joey Robertson was knocking on his car window. Plaintiffs car had struck a power pole adjacent to the highway. Plaintiff did not know how he had gotten there and did not recall what occurred when questioned by the patrolman. Plaintiff appeared to be dazed. The patrolman estimated plaintiffs speed at 30 miles per hour when the accident occurred. It appeared that plaintiff had just driven off the road.
20. Plaintiff was hospitalized at North Carolina Baptist Hospital in Winston-Salem from January 30, 1997 until February 5, 1997 for treatment of the injuries from the January 30, 1997 automobile accident. Plaintiffs injuries included a L1-L2 burst fracture and a right foot fracture treated by surgical open reduction and internal fixation. Plaintiff continued to see Dr. Robert Teasdall, a Baptist Hospital orthopedic surgeon, for his foot injury after leaving the hospital. As a result of his foot injury, plaintiff wears a special boot and has had swelling in the right foot and difficulty walking since the injury.
21. On April 30, 1997, plaintiff had at least two additional episodes similar to what he experienced on January 30, 1997. He had gone to a friends home to show the friend how to do some work on his house when an episode occurred. Plaintiff was seen at the local hospital emergency room on April 30, 1997 with complaints of seizures. He was brought by ambulance on the first occasion with a history of falling after feeling the seizure beginning and attempting to ease to the floor. Plaintiff reported a second seizure when seen later the same day.
22. By the summer of 1997, plaintiff was concerned about the "seizures he had experienced and profound changes in his personality and with a delay in arranging for an evaluation of this condition at Duke University Medical Center. Plaintiff was taking a number of psychotropic and anti-seizure medications, which included Depakote, Prozac, BuSpar and Dilantin. Plaintiff thus contacted the Charter Hospital in Greensboro after hearing an advertisement.
23. Plaintiff was admitted to the Greensboro Charter Hospital on June 30, 1997 and remained until 9 July 1997. His admission was for treatment of depression, insomnia, severe panic attacks and fearfulness to the point where he was double locking his doors to prevent anyone from entering his house and he did not leave his house. Plaintiff presented with a lot of sedation from overmedication. Plaintiff was having panic attacks and was depressed, hopeless and had useless feelings and feelings of not being able to function normally or do anything for himself. This hospital admission was required for treatment of plaintiffs "personality disorder and depression related to his organic brain injury.
24. Plaintiff came under the care of Dr. Rupinder Kaur, a Greensboro psychiatrist, when he was admitted to Charter Hospital. Dr. Kaur continued to see plaintiff until August 25, 1998. Defendants eventually approved Dr. Kaur as a treating physician.
25. During this hospitalization, Dr. Kaur made a number of adjustments in plaintiffs medications. While plaintiff stated to Dr. Kaur that he was overmedicated, Dr. Kaur observed he was more disinhibited. He was getting into everyones space, and it was difficult to redirect him in hospital groups throughout his stay. Plaintiffs medications actually were helping keep him under control. Dr. Kaur observed that plaintiff was impulsive, easily distractible and had a loss of capacity to comprehend things properly. She also observed plaintiff was somewhat inappropriate, unable to control his emotions much, and verbally explosive and flippant. Plaintiff was impaired in his judgment, attention and concentration. These observations were consistent throughout Dr. Kaurs thirteen months experience in treating plaintiff.
26. Dr. Kaurs findings were consistent with the diagnosis of a frontal lobe syndrome with affective lability secondary to encephalitis. The panic attacks and depression may be related to the organic brain injury or a chemical imbalance, which would have resulted from plaintiffs encephalitis.
27. Dr. Hurwitz saw plaintiff again on several occasions in 1997. On June 19, 1997, Dr. Hurwitz felt that plaintiff might have a seizure disorder. Plaintiff thus was admitted to Duke University Medical Center from August 11, 1997 through August 16, 1997 for further evaluation. Following this hospitalization, Dr. Hurwitz believed plaintiffs principal problem was an anxiety and personality disorder with significant impairment of attention and concentration skills and deficits in verbal memory and learning abilities. The seizure disorder was not documented by continuous video EEG monitoring while anti-epileptic drugs were removed. A brain MRI did demonstrate a large area of encephalomalcia within the right temporal lobe with involvement of the white matter of the right frontal lobe, which is compatible with encephalitis.
28. Following this hospitalization, Dr. Hurwitz found plaintiff capable of doing very basic and simple work in a sheltered workshop provided that plaintiff not be put under a lot of stress. On September 26, 1997, Dr. Hurwitz again felt that plaintiff should be enrolled in a sheltered workshop and emphasized the importance of making plaintiffs activities regular. Dr. Hurwitz further indicated that regular physical activities such as exercising at the Y are important. Furthermore, once plaintiff has met these goals, attempted cognitive training could be considered. Further, Dr. Hurwitz indicated that the possibility of significant improvement in plaintiffs condition is very small because of plaintiffs personality disorder. Finally, Dr. Hurwitz later came to the conclusion that plaintiffs personality disorder prevents plaintiff from participating in a sheltered workshop program.
29. Dr. Rupinder Kaur saw plaintiff following his discharge from Charter Hospital in July 1997. She saw plaintiff on a regular basis, prescribed his medications, and communicated with the rehabilitation nurses working with plaintiff from January 5, 1998 through at least August 25, 1998. Plaintiff contacted Dr. Kaurs office almost every other day concerning his medications and complaints regarding his circumstances. Plaintiffs condition remained much the same, without improvement or deterioration, throughout the time he was under Dr. Kaurs care.
30. Plaintiff was hospitalized by Dr. Kaur at the Greensboro Charter Hospital on a second occasion from April 13, 1998 through April 16, 1998 after he told her he was suicidal and planned to shoot himself. Plaintiffs diagnosis was depression. Plaintiffs condition improved, and he was discharged when he was able to contract with Dr. Kaur that he would not harm himself. This hospitalization was necessary to treat plaintiffs depression and in particular because plaintiff was suicidal.
31. Based on her extended experience with plaintiff, Dr. Kaur believes plaintiff will require a psychiatrist to monitor his condition and medications or a psychological counselor and an internist or psychiatrist to monitor his medication for the remainder of his life. Plaintiff will require psychotropic medication for the remainder of his life for depression. In addition to medication, plaintiff needs to see a mental health professional, on a weekly basis or perhaps more often, for therapy to help him cope with his life. This treatment could be provided at a local mental health center.
32. Dr. Kaur indicated that plaintiff needs structure so that his medications are monitored. She feels it is appropriate for plaintiff to visit the YMCA or similar place to exercise and socialize as long as this activity is supervised. This is because plaintiff exhibits poor judgment and is explosive, becomes vocally violent and is impulsive and agitated. He has the capacity and potential to get into altercations. In fact, Dr. Kaur recommended that plaintiff participate in a day program where he is in a more structured setting as opposed to living by himself. Dr. Kaur believes a group home or community residence should be considered. Plaintiff needs assistance in managing his money.
33. Based on her experience and treatment of plaintiff both in and out of the hospital over thirteen months, Dr. Kaur stated that plaintiff has not been employable in regular employment because of his inability verbally to deal with other people, his lack of inhibition, his impulsiveness, and inability to understand the consequences of his actions. Dr. Kaur does not believe plaintiff could "survive in the workplace or work with people because of his psychiatric problems.
34. Moreover, based on extensive experience with plaintiff, Dr. Kaur does not feel plaintiff is capable of entering a sheltered workshop or other formal vocational program, which would be very difficult for him. While Dr. Kaur initially felt otherwise, she now advises against placement in work in a sheltered workshop because of his inability to deal with people.
35. One of plaintiffs former employers, a contractor, loaned plaintiff $5,000 following plaintiffs October 1993 surgery based on plaintiffs assurance that he would pay him back at $7.00 per hour by helping him in the future when he was needed. Some time later, this contractor began requesting that plaintiff help him finish trim carpentry work on several jobs which other carpenters were unable to complete. Plaintiff was to pay back his loan in this manner. In late 1996 and early 1997, plaintiff worked alone as a carpenter on partial days completing projects when asked. He was not able to work a full day. Plaintiff was led to the work sites unless they were familiar to him. Plaintiff has still not completed paying off the loan. A private investigator hired by defendants had plaintiff under surveillance approximately forty-three days between March 15, 1995 and September 4, 1997 and plaintiff was observed on thirty-one of these days. There were five occasions in October and November 1996 when plaintiff was observed performing carpentry work for parts of days in houses or on a car wash under construction in Rockingham County. This activity, which was discovered through surveillance by defendants, was not included in the responses submitted by plaintiff to defendants discovery request.
36. Since January 24, 1995, plaintiff has been incapable of earning wages in his prior employment with defendant-employer or in any other employment in the competitive labor market as a result of the physical, cognitive and emotional impairments from his July 14, 1992 injury by accident and related encephalitis. Plaintiff has reached maximum medical improvement from the physical and psychological components of his injury by accident.
37. Plaintiff will not benefit from participation in a vocational evaluation at Goodwill Industries or in any other formal vocational rehabilitation evaluation or program and these programs will not restore his earning capacity.
38. On January 30, 1997, plaintiff became unconscious and wrecked his automobile because of a seizure, or because of a panic or anxiety attack caused by the effects of the compensable organic brain injury. Both Dr. McInnis and Dr. Kaur causally related this to plaintiffs compensable injury.
39. Plaintiffs June 30, 1997 Greensboro Charter Hospital admission was necessary for treatment of depression and for adjustment of plaintiffs medications for plaintiffs compensable organic brain injury.
40. Dr. Raouf Badawis August 7, 1996 examination was necessary to address plaintiffs participation in the Goodwill Industries evaluation proposed by defendants and plaintiffs permanent impairment from the cognitive and psychiatric components of plaintiffs injury by accident.
41. Plaintiff will require ongoing psychological therapy by a mental health professional and monitoring of medications by a psychiatrist or other medical doctor and perhaps periodic hospitalizations for the balance of his life as a result of the effects of his injury by accident.
42. Defendants appealed an Opinion and Award filed on October 21, 1999 by Deputy Commissioner William C. Bost, which was favorable to plaintiff.
 * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission concludes as follows
 CONCLUSIONS OF LAW
1. As a result of his injury by accident, including the cognitive, personality and emotional impairments as a consequence of the related organic brain injury from encephalitis, plaintiff is totally and permanently disabled and will continue to be for the remainder of his life. Thus, plaintiff is entitled to compensation at the rate of $253.53 per week for the remainder of his life. N.C.G.S. 97-29; Whitley v.Columbia Lumber Mfg. Co., 318 N.C. 89, 348 S.E.2d 336 (1986).
2. Plaintiff is not required to participate in a vocational evaluation at Goodwill Industries or in any other formal vocational rehabilitation evaluation or program or a futile search for employment. Neal v. CarolinaManagement, ___ N.C. ___, 510 S.E.2d 375 (1999).
3. Defendants are obligated to pay medical, surgical, hospital, nursing, medicines, sick travel and other medical expenses for treatment of the effects of plaintiffs injury by accident as may reasonably be required to effect a cure or give relief from the physical, cognitive, and emotional effects of plaintiffs injury. Defendants thus are required to pay for the expense incurred for plaintiffs June 30, 1997 Greensboro Charter Hospital admission and Dr. Raouf Badawis August 7, 1996 examination. The hospital admission and Dr. Badawis examination are approved. N.C.G.S. 97-2(19); 97-25.
4. Defendants are obligated to pay the medical expenses incurred for treatment of plaintiffs lumbar spine and right foot injuries occurring on January 30, 1997. These injuries were the direct and natural result of the original compensable injury. N.C.G.S. 97-2(19); 97-25.
5. Furthermore, defendants are required to provide for such future necessary medical, surgical, hospital, nursing, medicines, sick travel and other treatment as may reasonably be required to give relief or lessen plaintiffs disability. N.C.G.S. 97-25.1.
6. Plaintiffs omissions and nondisclosure in his responses to defendants interrogatories constitute a failure to answer interrogatories pursuant to Rule 37 of the North Carolina Rules of Civil Procedure. As a result defendants are entitled to a reasonable award of expenses including reasonable attorneys fees in the amount of $760.59. I.C. Rule 802.
7. Plaintiff is entitled to $750.00 in expenses including reasonable attorneys fees as a result of defendants appeal to the Full Commission. N.C.G.S. 97-88.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall continue to pay plaintiff compensation for total disability for the remainder of his life at the rate of $253.53 per week, subject to the deduction and payment of the attorneys fees previously approved by the Commission for the services of his attorney.
2. Defendants shall pay plaintiffs necessary medical expenses, including expenses incurred for the injuries sustained on January 30, 1997, for the June 30, 1997 Greensboro Charter Hospital admission, and for Dr. Raouf Badawis August 7, 1996 examination, and shall continue to pay medical compensation as may reasonably be required to give relief or lessen plaintiffs disability, when bills for the same have been processed in accordance with the Workers Compensation Act and rules of the North Carolina Industrial Commission.
3. Plaintiff shall pay reasonable expenses including reasonable attorneys fees in the amount of $760.59 as a result of plaintiffs discovery abuse.
4. Defendants shall pay $750.00 in expenses including reasonable attorneys fees as a result of defendants appeal to the Full Commission.
5. Defendants shall pay the costs.
This the ___ day of November 2000.
 S/_________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
 S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER